**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| **WILDFIRE CREDIT UNION, a** | ) | |
| **Michigan credit union,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FISERV, INC., a Wisconsin** | ) | |
| **corporation, also known as** | ) | |
| **FISERV SOLUTIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | **JURY TRIAL REQUESTED** |

## COMPLAINT

Plaintiff, WILDFIRE CREDIT UNION, by and through its

attorneys, Kus Ryan & Associates, PLLC, hereby states for its

complaint against defendant, FISERV, INC., also known as FISERV

SOLUTIONS, INC., as follows:

## JURISDICTION AND VENUE

This is a civil action where the matter in controversy exceeds

the sum or value of $75,000, exclusive of interest and costs, and is

between citizens of different States, and this Court has original

jurisdiction pursuant to 28 U.S.C. §1332.

The principal events giving rise to the claims stated herein occurred in this District, and venue is therefore proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (2).

This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §2201(a) and §2202.

## THE PARTIES

1.      Plaintiff Wildfire Credit Union ("Wildfire") is a Michigan credit union, whose principal office is located at 6640 Bay Road, Saginaw, Michigan.

2.      Defendant Fiserv, Inc., which is also known as Fiserv Solutions, Inc. ("Fiserv") is a corporation organized under the laws of the State of Wisconsin, whose principal offices are located in Brookfield, Wisconsin and Glastonbury, Connecticut.

## FACTUAL ALLEGATIONS

3.      On October 25, 2012, Timothy W. Benecke, President/CEO of Wildfire, and Mark Schuiling, Wildfire's Vice-President of Technology, met with Jason Escue, a Fiserv sales representative, regarding Fiserv's desire to provide Wildfire with financial services technology products.  During this meeting, Escue

was promoting a Fiserv product called "Acumen" and attempting to sell that product to Wildfire.

4.   On November 19, 2012, Fiserv presented a demonstration of Acumen to Benecke and Schuiling.

5.   On December 21, 2012, Fiserv representatives met with Benecke and Schuiling to provide an overview of the Acumen technology.

6.   On January 8 and 9, 2013, Fiserv representatives came to Wildfire's offices to provide a "hands-on" demonstration of Acumen for Wildfire's vice presidents and managers.

7.   At all times from October, 2012 until mid-January, 2013, the Fiserv representatives who met with Wildfire representatives promoted Acumen as the product which would satisfy Wildfire's core system needs.

8.   A core system is the central data processing system upon which a credit union's entire operation relies to deliver banking products to its members.

9.   On January 14, 2013, Fiserv announced that it had purchased Open Solutions, Inc. ("OSI") for $55 million and had assumed $900 million in debt (a copy of the Bloomberg news report,

"Fiserv Buys Open Solutions to Grow Financial Services",

http://www.bloomberg.com/news/2013-01-15/fiserv-buys-open-solutions-to-grow-financial-services.html, is attached hereto as

Exhibit 1).

10.    On its website, Fiserv states that its acquisition of OSI

added "DNA™, an innovative real-time account processing platform

option for clients" (https://www.fiserv.com/about/30-years.aspx).

11.    Immediately upon Fiserv's acquisition of OSI, Fiserv

representatives dropped their promotion of Acumen to Wildfire and

began promoting OSI's DNA instead.

12.    Wildfire's representatives had made clear that the product

in which Wildfire was interested was Acumen, and so Fiserv's

representatives represented to Wildfire that Acumen and DNA were

being merged, and that the Acumen screens would be overlaid on top

of DNA, thereby giving Wildfire the elements of Acumen in which it

had been interested.

13.    The Acumen overlay was important to Wildfire because

the Acumen User Interface ("UI") was very clean and elegant looking,

while from the beginning the DNA UI looked convoluted and

confusing.  Wildfire would not have been interested in DNA if the UI

was not going to change, but the promise by Fiserv that the Acumen screens would replace the DNA screens alleviated that concern on the part of Wildfire.

14.    On February 6, 2013, Fiserv representatives - Jason Escue, Sales Executive; Jason Woods, DNA Solution Consultant; and Greg Disterhoft, Sales Solution Consultant - met with Benecke and Schuiling regarding DNA (the agenda of the February 6, 2013 meeting is attached hereto as Exhibit 2).

15.    On February 8, 2013, Fiserv representatives met with Wildfire's representatives to discuss pricing if Wildfire were to change from its existing platform which had been provided by Symitar, a competitor of Fiserv.

16.    Throughout February and March, 2013, Fiserv's representatives met in person and by telephone with Wildfire's representatives to try to convince them to cease being a Symitar client and become a Fiserv client instead.  During these meetings and telephone conferences, Fiserv's representatives made promises and representations regarding Fiserv's products, including DNA, and talked extensively about the logistics of implementing DNA.

17.    On March 20, 2013, Fiserv representatives - Jason Escue, Sr. Sales Executive; Wayne Eisner, Vice President of Sales; Jason Woods, Sr. DNA Solution Consultant, Greg Disterhoft, DNA Solution Consultant; and Dave Brim, DNA App Specialist - met all day with Benecke and Schuiling and Wildfire vice-presidents and key IT staff (the agenda of the March 20, 2013 meeting is attached hereto as Exhibit 3).

18.    The March 20th meeting included a demonstration of the DNA core system, as well as presentations by Fiserv's representatives regarding reporting and business intelligence; loan servicing; marketing, campaign management and incentives; and a technology overview. During the Technology Overview portion of the meeting, Chris VanDer Stad of Fiserv presented a "4.0 UI Preview," which included the screens of 4.0, the version of the product which the Fiserv representatives promised would be provided to Wildfire. Jason Escue showed the Wildfire representatives screen shots of a version of the merged Acumen/DNA screens.

19.    On March 21, 2013, Fiserv representatives continued to meet with representatives of Wildfire, discussing Fiserv products which Wildfire could use to develop its own applications.  During this,

and subsequent meetings regarding applications, Fiserv representatives repeatedly promised that we were able to use the DNA platform product, DNAcreator, to make any changes or additions to DNA that Wildfire saw fit.

20.   On March 28, 2013, Fiserv's representatives met with Wildfire's representatives for a "hands-on lab" of DNA and related products (the agenda of the March 28, 2013 labs is attached hereto as Exhibit 4).

21.   On April 1, 2013, Benecke and Schuiling met with Escue to review Fiserv's proposal to Wildfire.  During this meeting, Escue represented that "everything is in the contract and we can pull it out if it isn't needed."

22.   The Fiserv representatives never discussed or indicated that a conversion from Wildfire's current core system provided by Symitar to the DNA platform would be especially difficult or unusually challenging due to their lack of experience with converting from the Symitar system to the DNA system.

23.   During April and May, 2013, Fiserv representatives communicated with Wildfire's representative in person, by telephone conferences and through email transmissions, demonstrating various

aspects of Fiserv's product, including but not limited to accounting, collections and in-house credit card processing.

24.     Throughout the sales process, the Fiserv representatives told the Wildfire representatives that they knew that Wildfire used the Symitar platform as its core system for the financial services technology for the credit union and that Fiserv wanted to expand its client base by converting credit unions on the Symitar platform to the Fiserv/DNA platform.

25.     On June 14, 2013, Benecke and Schuiling met with Fiserv representatives at Fiserv's corporate offices.  Fiserv's representatives included Jeffrey Yabuki, Chief Executive Officer; Dave Brim, now Vice President Technical Consultant; Santo Canone, DNA, Chief Product Officer; Wayne Eisner, Vice President, Sales; Jason Escue, Sales Executive; and Andres Pasantes, Senior Vice President, DNA National Sales Manager.

26.     The morning-long meeting included presentations by Fiserv representatives regarding DNA updates and priorities, the DNAAppStore, product management organization, account management organization, content of DNA 4.0 and 4.1, a DNA technology update, DNAcreator and an executive discussion among

Yabuki, Benecke and Schuiling (the agenda of the June 14, 2013 meeting is attached hereto as Exhibit 5).

27.    During this meeting, Schuiling inquired as to why Fiserv thought that gaining Wildfire as a client was so important to Fiserv. Yabuki answered that it was because Wildfire's current core system was one which was provided by Symitar and that Fiserv's strategic direction was to make in-roads into the Symitar customer base. Schuiling indicated that, with all of the complexities of a core system, it is nearly impossible to vet every aspect of the system, so the decision to move forward in changing that system is largely based on trust, and asked Yabuki directly why should Wildfire trust him? Yabuki agreed that there was a lot of trust involved and made it clear that Fiserv was committed to DNA as its platform of the future, and that Fiserv had and would be committing significant resources to DNA and therefore Wildfire could trust him that this will be successful.

28.    During June and the first part of July, 2013, Fiserv representatives continued to provide demonstrations and participate in telephone conferences with Benecke and Schuiling, making promises about what Wildfire would receive from the conversion from a Symitar platform to that offered by Fiserv.

29.    Based on the representations of Fiserv and its representatives, which were false at the time they were made to representatives of Wildfire, on July 18, 2013, Wildfire entered into a "Master Agreement" and its attached Schedules and Exhibits ("Master Agreement") with Fiserv (a copy of the Master Agreement, Exhibits and Schedules is submitted under seal as Exhibit 6).

30.    These representations which Fiserv representatives made, which they knew were false at the time they made them, include, but are not limited to, the representations set forth in the preceding paragraphs, as well as that that DNA can do everything Wildfire wanted it to do, because it is open and flexible and can write applications, and that Fiserv would hit a "home run" with this conversion.

31.    The false representations which Fiserv representatives made to induce Wildfire to sign the Master Agreement were material.

32.    Fiserv representatives made these false representations with the intention that Wildfire would act upon them.

33.    Wildfire did act in reliance on the false representations and entered into the Master Agreement.

34.    The material misrepresentations made by Fiserv representatives to Wildfire regarding Fiserv's future conduct were made under circumstances in which the misrepresentations may reasonably be expected to be relied upon by Wildfire and Wildfire did in fact rely upon them as the inducement to enter into the Master Agreement.

35.    On August 19, 2013, Wildfire representatives participated in an introductory call with Neil Jones, who had been designated as Project Manager for Wildfire's conversion.

36.    On December 11 and 12, 2013, Wildfire representatives had a "kickoff" meeting with Jones.

37.    As Wildfire came to learn, Jones had no working knowledge of DNA or any of the other products and services which Wildfire had purchased.

38.    On February 3, 2014, Benecke sent email correspondence to Jones, indicating problems that Wildfire was already experiencing with communications and training, such as the fact that the Fiserv trainers did not even know what products and services Wildfire had purchased and on which its employees needed

training (a copy of the email correspondence from T. Benecke to N. Jones, February 3, 2014, is attached hereto as Exhibit 7).

39.    Despite promises to the contrary, issues with communication and training did not improve, and new problems began to arise with what Wildfire termed "gaps," or missing functionality between what Wildfire had in its existing Symitar platform and what could be implemented in the DNA platform.

40.    On April 8, 2014, Schuiling sent email correspondence to Jones and Ann Miela, OSI Vice President of Program Management, indicating that he had started compiling a list of the issues being reported by Wildfire to Fiserv, and the list represented the gaps with trying to convert the core system from the existing Symitar platform to the DNA platform (a copy of the email correspondence from M. Schuiling to A. Miela and N. Jones, April 8, 2014, is attached hereto as Exhibit 8).

41.    The "gaps" were being discovered during the testing of the system, the training of Wildfire's employees and while they worked with the DNA consultants on set-up.  The first "Gaps list" was attached to Schuiling's email correspondence (Exhibit 8).

42.   This "Gaps list" was not the total of the issues and problems which Wildfire was experiencing, and Schuiling sent additional email correspondence detailing those problems.

43.   For example, on April 22, 2014, Schuiling sent email correspondence to Jones regarding the usability issues which Wildfire was experiencing (a copy of the email correspondence from M. Schuiling to N. Jones, April 22, 2014, is attached hereto as Exhibit 9). The "Usability list" was attached to Schuiling's email correspondence.

44.   Although Wildfire representatives began having daily telephone conferences with Jones, Miela and Frymyer as of April 9, 2014, this did not remedy the problems and issues which Wildfire was experiencing.

45.   On April 15, 2014, Miela; Chris VanDer Stad, OSI Chief Technology Officer; and Jan Frymyer, OSI Vice President of Training, met with Wildfire representatives at Wildfire's office.  During dinner that evening, VanDer Stad stated that Fiserv was not going to be redoing all of the screens of DNA, contrary to Escue's representations to Wildfire before it signed the Master Agreement.

46.   On April 16, 2014, Steve Cameron, OSI President, met with Wildfire representatives at Wildfire's office for 30 minutes.  In that

meeting, Cameron promised that Fiserv would "do better" and that Wildfire was important and that he "gets it."

47.    Wildfire representatives continued meeting with Fiserv/OSI representatives for training strategy; regarding DNACreator; and in attempts to resolve the issues in the Gaps list and the Usability List, but the problems and issues Wildfire was continuing to experience were not resolved by Fiserv.

48.    Jason Woodford, a Wildfire developer, attended training on the DNACreator product during the week starting April 28, 2014. During that training, Wildfire learned for the first time that all applications which Wildfire itself developed using DNACreator were required to go through a validation process and then would be placed in Fiserv's DNAAppStore for sale to third parties, such as other credit unions.

49.    On May 8, 2014, a new Fiserv Program Manager, Erik Ristow, began working with Wildfire.  Jones' last day working with Wildfire was May 21, 2014.  Jan Walsh was added as the new Project Manager.

50.    During a demonstration at Wildfire on May 8, 2014, Wildfire representatives noticed that there were differences between

what they had received after they signed the Master Agreement and what was shown to them during this and the pre-Master Agreement demonstrations.

51.    On May 13 and 14, 2014, during retraining, it became clear to Wildfire representatives that, contrary to Fiserv's representations, DNA was not as efficient as Symitar.  Wildfire representatives asked Fiserv representatives if there was something they were missing to correct that fact, but received no solution.

52.    Wildfire's problems with Fiserv's products and services continued escalating.

53.    On June 12, 2014, Benecke spoke by telephone with Byron Vielehr, Fiserv Group President, Depositary Institutions, for approximately 30 minutes.  Vielehr indicated to Benecke that the sales of the DNA system had increased and that many new employees had been added to the OSI division.  This information, however, did not provide Wildfire with any solution to the growing problems which were engulfing the implementation of the conversion of its core system from the Symitar platform to the DNA platform, particularly as to deposit functionality and loan functionality.

54.    On June 16, 2014, Schuiling met with Santo Canone, OSI Chief Product Officer, to discuss a DNACreator agreement which would allow Wildfire to keep the applications it developed internally and not have to go through the validation process or be compelled to offer the Wildfire-developed applications to third parties through Fiserv's DNAAppStore.  Canone presented some options to Wildfire, but none of them met Wildfire's requirements or addressed its concerns.

55.    On June 24, 2014, Benecke and Schuiling spoke with Sam Boggs, OSI Chief Operating Officer, regarding the status of the project and the DNACreator agreement.  When asked about the status of the DNACreator agreement, Boggs indicated that getting what Wildfire was looking for in that agreement - retention of its own Wildfire-developed applications - was going to be hard.  Schuiling stated during the discussion about the project that Wildfire cannot keep having these setbacks and stumbling blocks.  Boggs agreed with this statement.  Benecke and Schuiling requested that Boggs provide them with a description of what was actually going to be in version 4.1 of DNA.  Despite promises that he would provide that information to Benecke and Schuiling, Boggs never did.

56.     Wildfire representatives continued testing on-site and speaking with Fiserv representatives, but the problems and issues continued to mount.

57.     On July 28, 2014, Benecke and Schuiling spoke with Escue about the issues with the conversion from the Symitar platform to the Fiserv platform, and Escue recommended that they discuss these problems with Vielehr.

58.     On July 29, 2014, Benecke and Schuiling spoke with Vielehr regarding all the issues Wildfire was experiencing with the conversion.  To the surprise of Benecke and Schuiling, Vielehr was surprised that the problems which Wildfire had been experiencing had not yet been resolved and were not improving, illustrating once again to Benecke and Schuiling that there were communication problems within Fiserv.

59.     On July 30, 31 and August 1, 2014, Fiserv representatives Lizette Nigro, OSI Vice President - DNA Product Strategy; Sue Pisonneault, Liza Lauretti, Jan Walsh and Erik Ristow met with Wildfire representatives at Wildfire's office to conduct a review on Wildfire's Gap list.  At dinner one evening, Nigro made the

comment that Santo Canone, OSI Chief Product Officer, had asked her "is this worth salvaging?"

60.   On August 14, 2014, Fiserv representatives Cameron, Canone and Boggs met with Wildfire representatives at Wildfire's office.  During this meeting the Fiserv representatives promised that the "executive sponsor" for Wildfire would change from Boggs to Canone, that there would be changes in the DNACreator agreement, that they would add mapping meetings and client visits, and would provide project management services with NextStep.  Benecke and Schuiling told the Fiserv representatives that they had heard similar promises and offers before, which were never met or provided.

61.   On August 15, 2014, Fiserv representatives, including Jason Woods, met with Wildfire representatives to discuss some standard features of the system and how best to convert certain data. Wildfire representatives deemed this meeting a disaster.  The Fiserv representatives did not have the necessary knowledge and understanding of their system to address the issues at hand and when asked the question of which roles are built into the system and what, if any, is the functionality behind them, Woods answered that

the DNA system he used for demonstrations was so customized, he did not even know what was standard any more.

62.    On August 22, 2014, Benecke met with Vielehr in Milwaukee, Wisconsin.  Benecke commented to Vielehr that Wildfire felt strategically important to Fiserv after their meeting with Yabuki on June 14, 2013, but had never felt valued by OSI and were being treated like any other conversion, not as a conversion from the Symitar platform.  Benecke made it clear that Wildfire could not go backwards by converting to a less efficient system - it would be bad for the members, employees, Wildfire and Fiserv.  Benecke also commented that they have escalated the conversion issues to the top of OSI, had lost confidence in OSI's ability to remedy the issues and that they were tired of hearing promises which were never met.

63.    On August 27, 2014, Nigro, Canone, VanDer Stad and Andres Pasantes, Fiserv Senior Vice President for National Sales, met with Wildfire representatives at Wildfire's office to present a plan to address the "Gaps" list and "Usability Issues."  The Fiserv representatives indicated that Wildfire would be "married at the hip" with Fiserv's product department for the next one to three years as

they were only able to complete three to eleven of the roughly 70 known issues prior to the scheduled conversion date.

64.     Also on August 27, 2014, Wildfire representatives (there were at least 20 people in attendance) learned from Fiserv that a referral feature which it had been promised six months earlier and which was represented to be "better than Symitar," and which was in Fiserv's written Best Practices report as available, was in fact not available.

65.     On September 11, 2014, Benecke spoke with Vielehr, and advised him that it was apparent that, contrary to the dates in the Schedules which were part of the Master Agreement, the conversion from the current Symitar platform to that of DNA was not going to happen timely or successfully, and that accordingly Wildfire had to terminate the contract.  Benecke sent Vielehr a letter setting forth these issues on the same date (a copy of the letter from T. Benecke to B. Vielehr, September 11, 2014, is attached hereto as Exhibit 10).

66.     In its experience since entering into the Master Agreement, Wildfire recognized that a successful or timely conversion could not occur, and that there had been too many setbacks and problems from the beginning.

67.    Despite the fact that Fiserv had Wildfire's "Gaps" list and "Usability Issues" list since April, 2014, nothing had happened to remedy the issues in those lists.

68.    In addition to the functionality problems, some of the trainers were unprepared and had just recently themselves been trained.  They did not know what products Wildfire had purchased on which the Wildfire employees had to be trained.

69.    Despite being promised by Fiserv representatives that Wildfire would be getting "the 'A' team" for the conversion, Wildfire instead was forced to interact with Fiserv representatives who were without knowledge or information necessary to successfully implement the conversion, as can be seen from the fact that Fiserv kept pulling its employees off the project that Wildfire did not want back, such as Darcy Carroll (trainer); Hoa Nguyen (field tech); Joe Mertz (loan training); and Nicole Griffin (IT backoffice trainer), or that Fiserv just removed or phase out, such as Neil Jones (project manager) and Emily Quinn (deposit consultant).

70.    On September 18, 2014, Vielehr was to meet with Benecke and Schuiling and Wildfire vice presidents to discuss Wildfire's significant issues.  Benecke and Schuiling had prepared a

detailed outline of the topics they wanted to discuss at this meeting, which they put into a written document which they could use, which they entitled "Byron Meeting Agenda" (a copy of the "Byron Meeting Agenda" is attached hereto as Exhibit 11).  However, when Benecke and Schuiling actually met with Vielehr, they were not able to address most of their concerns as expressed in the "Byron Meeting Agenda," as it became clear that Vielehr was not interested in reviewing the issues.  Instead, Vielehr made statements to them such as,

> "Do you understand the financial ramifications of terminating the contract?"

> "60% of the gap items will benefit existing DNA clients"

> "What is it going to look like if we can't convert a credit union like Wildfire?"

> "[Wildfire] is making an emotional decision" to terminate the contract

71.    During this meeting, when Vielehr said, "we can pull numbers from other credit union call centers to compare efficiencies," Benecke and Schuiling replied that they had engaged in role playing and had timed the transactions in both systems, and that Symitar was faster than DNA.

72.    Wildfire determined that since Fiserv could not perform as set forth in the Master Agreement and that it had been materially

misled into entering into the Master Agreement, the Master Agreement should be declared void or terminated and Wildfire should be refunded the $1,360,568.18 it had already paid to Fiserv for products and services which it had not received.

73.    Wildfire requested that Fiserv declare the Master Agreement void and/or terminated and that Fiserv return to Wildfire the $ 1,360,568.18 it had already paid to Fiserv for products and services which it had not received, but Fiserv refused.

74.    Wildfire has been damaged by Fiserv's actions, not only by the fact that Fiserv retains the $ 1,360,568.18 which Wildfire had already paid to Fiserv for products and services which it had not received, but because of the loss in productivity and employee hours spent in trying to assist in a platform conversion which could not be achieved successfully or timely.

## COUNT I

## DECLARATORY RELIEF

75.    Wildfire incorporates by reference paragraphs 1 through 74, as if fully re-alleged herein.

76.    Based on the material misrepresentations of Fiserv and its representatives, on July 18, 2013, Wildfire entered into the Master Agreement (Exhibit 6).

77.    The material misrepresentations made by Fiserv representatives to Wildfire regarding Fiserv's future conduct were made under circumstances in which the misrepresentations may reasonably be expected to be relied upon by Wildfire and Wildfire did in fact rely upon them as the inducement to enter into the Master Agreement.

78.    Based on Fiserv's conduct in making material misrepresentations to Wildfire regarding Fiserv's future conduct which were made under circumstances in which the misrepresentations may reasonably be expected to be relied upon by Wildfire and which in fact were relied upon by Wildfire as the inducement to enter into the Master Agreement, Fiserv committed fraud in the inducement of Wildfire's execution of the Master Agreement.

79.    Fiserv's fraud in the inducement renders the Master Agreement voidable at the option of Wildfire, the defrauded party.

80.    Wildfire wishes to rescind the Master Agreement and obtain a refund of all monies paid to Fiserv under the Master Agreement.

81.    Wildfire accordingly seeks from this Court a declaration that the Master Agreement is void and Wildfire is entitled to rescind the Master Agreement and receive back from Fiserv the funds it paid to Fiserv under the Master Agreement.

WHEREFORE, Wildfire respectfully requests that this Court enter a declaratory judgment in Wildfire's favor that the Master Agreement is void and that Wildfire is entitled to rescind the Master Agreement and receive back from Fiserv the funds it paid to Fiserv under the Master Agreement

## COUNT II

## FRAUDULENT MISREPRESENTATION

82.    Wildfire incorporates by reference paragraphs 1 through 81, as if fully re-alleged herein.

83.    Fiserv, through its representatives, specifically and intentionally made representations to Wildfire's representatives during their business relationship, as set forth in the Factual Allegations,

which are incorporated herein as if fully re-alleged herein, which Fiserv knew were false at the time they were made to Wildfire.

84.    Fiserv made these misrepresentations to Wildfire knowing that Wildfire would rely and act upon them.

85.    Wildfire did rely and act upon Fiserv's false representations, and entered into the Master Agreement, to Wildfire's detriment.

86.    Fiserv's actions and false representations constitute fraudulent misrepresentation.

87.    Wildfire has suffered and will continue to suffer injury from Fiserv's fraudulent misrepresentations.

WHEREFORE, Wildfire respectfully requests that this Court enter judgment in Wildfire's favor and against Fiserv in an amount to be determined by a jury that compensates Wildfire for Fiserv's injuries to Wildfire, plus costs, interest and attorneys' fees.

### COUNT III

### NEGLIGENT MISREPRESENTATION

88.    Wildfire incorporates by reference paragraphs 1 through 87, as if fully re-alleged herein.

89.    In order to induce Wildfire to enter into the Master Agreement, Fiserv made certain representations to Wildfire, as set forth in the Factual Allegations, which are incorporated herein as if fully re-alleged herein, which were untrue.

90.    Fiserv's representations were material.

91.    Based on Fiserv's course of conduct as to Wildfire since the execution of the Master Agreement, Fiserv has demonstrated to Wildfire that Fiserv's representations were made either negligently or with a disregard of the truth or falsity of these representations.

92.    Fiserv made the representations with the intent that Wildfire rely on them, knowing fully that Wildfire would pay considerable sums of money and invest great amounts of time into the conversion of its core system from the Symitar platform to the DNA platform.

93.    Wildfire reasonably relied on Fiserv's representations and invested considerable sums of money and great amounts of time into the conversion of its core system from the Symitar platform to the DNA platform.

94.    As a direct and proximate result of Fiserv's negligent misrepresentations, Wildfire has suffered and will continue to suffer injury.

WHEREFORE, Wildfire respectfully requests that this Court enter judgment in Wildfire's favor and against Fiserv in an amount to be determined by a jury that compensates Wildfire for Fiserv's injuries to Wildfire, plus costs, interest and attorneys' fees.

## COUNT IV

## SILENT FRAUD

95.    Wildfire incorporates by reference paragraphs 1 through 94, as if fully re-alleged herein.

96.    In order to induce Wildfire to enter into the Master Agreement, Fiserv made material representations to Wildfire as set forth in the preceding Factual Allegations, which are incorporated herein as if fully re-alleged herein.

97.    Fiserv's representations were material.

98.    Fiserv had a legal and/or equitable duty of disclosure of the fact that its representations were not accurate or true at the time Wildfire was about to enter into the Master Agreement.

99.    Based on Fiserv's course of conduct as to Wildfire over the past year, Fiserv has demonstrated to Wildfire that Fiserv's representations to Wildfire were false or incomplete when they were made, and that these representations conveyed a false impression and were plainly intended to mislead Wildfire.

100.   Wildfire reasonably relied on Fiserv's representations and paid considerable sums of money and invested great amounts of time into the conversion of its core system from the Symitar platform to the DNA platform.

101.   As a direct and proximate result of Fiserv's fraudulent acts and omissions, Wildfire has suffered and will continue to suffer injury.

WHEREFORE, Wildfire respectfully requests that this Court enter judgment in Wildfire's favor and against Fiserv in an amount to be determined by a jury that compensates Wildfire for Fiserv's injuries to Wildfire, plus costs, interest and attorneys' fees.

## COUNT V

## BREACH OF CONTRACT

102.   Wildfire incorporates by reference paragraphs 1 through 101, as if fully re-alleged herein.

103.   As set forth above in the preceding Factual Allegations, Wildfire entered into the Master Agreement with Fiserv under which Fiserv was obligated to provide products and services in accordance with the Schedules.

104.   Wildfire has performed all of its obligations under the Master Agreement.

105.   Fiserv has failed to meet its obligations under the Master Agreement.

106.   Fiserv's failure to meet its obligations under the Master Agreement constitutes a material breach of the Master Agreement.

107.   Wildfire has suffered injury from Fiserv's failure to meet its obligations under the Master Agreement.

WHEREFORE, Wildfire respectfully requests that this Court enter judgment in Wildfire's favor and against Fiserv in an amount to be determined by a jury that compensates Wildfire for Fiserv's injuries to Wildfire, plus costs, interest and attorneys' fees.

Respectfully submitted,


/s/ Cindy Rhodes Victor
CINDY RHODES VICTOR (P33613)
MICHAEL A. KUS (P27186)
JEFFREY S. HOROWITZ (P66251)
Kus Ryan & Associates PLLC
2851 High Meadow Circle
Suite 120
Auburn Hills, Michigan  48326
(248) 364-3090
cvictor@victorfirm.com
mkus@krslaw.biz
jhorowitz@krslaw.biz


Attorneys for Plaintiff
Wildfire Credit Union

Dated:      November 13, 2014


### DEMAND FOR JURY

Plaintiff Wildfire Credit Union, by and through their attorneys,

Kus Ryan & Associates, PLLC, hereby demands a trial by jury on

their causes of action against defendant Fiserv, Inc., also known as

Fiserv Solutions, Inc.

Respectfully submitted,


/s/ Cindy Rhodes Victor
CINDY RHODES VICTOR (P33613)
MICHAEL A. KUS (P27186)
JEFFREY S. HOROWITZ (P66251)
Kus Ryan & Associates PLLC
2851 High Meadow Circle
Suite 120
Auburn Hills, Michigan  48326
(248) 364-3090
cvictor@victorfirm.com
mkus@krslaw.biz
jhorowitz@krslaw.biz


Attorneys for Plaintiff
Wildfire Credit Union

Dated:      November 13, 2014