UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILDFIRE CREDIT UNION,

    Plaintiff/Counter-Defendant,                  Case No. 14-cv-14359

v.                                                        Honorable Thomas L. Ludington

FISERV, INC., a/k/a FISERV SOLUTIONS, INC.,

    Defendant/Counter-Plaintiff,

OPEN SOLUTIONS, LLC,

    Counter-Plaintiff.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Wildfire Credit Union filed a five-count complaint against Defendant Fiserv, Inc. on November 13, 2014. ECF No. 1. Wildfire's complaint seeks a declaratory judgment in Count I and alleges in Counts II-IV that Fiserv committed various torts related to non-contractual representations that Fiserv did not fulfill. In Count V, Wildfire alleges breach of contract. Fiserv moved to dismiss Counts I-IV of Wildfire's complaint. *See* Partial Mot. Dismiss, ECF No. 9. That motion was granted in part on August 10, 2015 and Counts I-IV of Wildfire's complaint were dismissed with prejudice. Aug. 10, 2015 Op. & Order, ECF No. 37.

The same day that Fiserv filed its motion to dismiss, it also filed a counterclaim against Wildfire. *See* Counterclaim, ECF No. 10. On September 29, 2015, Fiserv obtained permission to amend its counterclaim to include Open Solutions, LLC, as a counter-plaintiff against Counter-Defendant Wildfire. The amended counterclaim alleges that Wildfire breached the Master

Agreement between the parties. *See* Am. Counterclaim, ECF No. 42. It further alleges that Wildfire is now liable to Counter-Plaintiffs Fiserv and Open Solutions for early termination fees in the form of accelerated maintenance fees that were accrued during the operative term of the Master Agreement.

Wildfire timely answered the amended counterclaim on October 20, 2015. See Answer to Counterclaim, ECF No. 45. It then moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). See Pl.'s Mot. J., ECF No. 46. It argues that Fiserv's claims in the Amended Counterclaim that arise under the DNA Software Schedule to the Master Agreement should be dismissed because Fiserv is not a party to the DNA Software Schedule and thus lacks standing to enforce it. Similarly, it argues that Open Solutions' claims in the Amended Counterclaim that arise under the Master Agreement itself should be dismissed because Open Solutions is not a party to the Master Agreement and thus lacks standing to enforce it. Next, Wildfire seeks dismissal of Counter-Plaintiffs' claims for accelerated maintenance fees because the condition precedent to Wildfire paying those fees never occurred and, alternatively, Counter-Plaintiffs breached the Master Agreement, relieving Wildfire of any obligation to pay the fees.

**I.**

Wildfire is a Michigan-based credit union principally located in Saginaw, Michigan. Fiserv is a Wisconsin corporation headquartered in Brookfield, Wisconsin. It "is a global leader in financial services technology, providing, among other things, account processing systems, electronic payment processing, products and services, internet and mobile banking systems and related solutions to a wide variety of financial institutions, including credit unions." Am. Counterclaim ¶ 2, ECF No. 42. Open Solutions is a Delaware limited liability company that is

headquartered in Glastonbury, Connecticut. It "is an 'Affiliate' of Fiserv as defined by the parties' Master Agreement." Id. at ¶ 3.

### A.

In October of 2012, representatives from "Wildfire and Fiserv first met to discuss a potential change to Wildfire's core processing system from software provided by Symitar to solutions provided by Fiserv." *Id*. at ¶ 9. "A core system is the basic technology platform that a financial institution uses to perform and deliver banking services to its customers." *Id*. The core system marketed to Wildfire by Fiserv and Open Solutions was named DNA.

### B.

On July 18, 2013, the parties executed a "Master Agreement" that set forth the terms of Wildfire's transition to the core processing system provided by Counter-Plaintiffs. The Master Agreement contains a number of exhibits, schedules, appendices, and attachments all of which constitute the entire Master Agreement. Under the Master Agreement, Wildfire agreed to pay certain licensing fees to Counter-Plaintiffs for the use of the core processing system software. Wildfire also agreed to pay maintenance fees to Counter-Plaintiffs for maintenance services.

### C.

Following the execution of the Master Agreement, "the parties began the implementation and conversion process, during which Fiserv and Open Solutions trained Wildfire on how to use DNA and related programming tools, and the parties used DNA in a testing mode in an effort to customize its applications to Wildfire's unique institutional needs." *Id*. at ¶ 14.

On September 11, 2014, Wildfire's President and Chief Executive Officer wrote to Fiserv that Wildfire would be ending its conversion to the DNA core system. Wildfire "demanded a full refund of fees paid to Fiserv for DNA." Id. at ¶ 15. The letter preceded Wildfire's "live" date

with the DNA core system. The "live" date "means the actual date on which the processing of [Wildfire]'s data in an actual production mode (as opposed to testing mode) using the Software System first occurs or [redacted date[1]] whichever occurs first." DNA Software Schedule to the Software Products Exhibit § 2(b), Ex. 1, Pl.'s Mot. J., ECF No. 46-2.

Wildfire wrote to Fiserv again on October 7, 2014 and demanded termination of the Master Agreement. Wildfire alleged that Fiserv breached the Master Agreement "because the conversion of Wildfire to DNA cannot successfully occur within the timeline which Fiserv promised, and in the manner which Fiserv promised." Am. Counterclaim ¶ 16, ECF No. 42 (internal quotation marks omitted). Fiserv denied this allegation.

**D.**

Counter-Plaintiffs, believing Wildfire to be in breach of the Master Agreement, sent an invoice to Wildfire on November 19, 2014. The invoice billed Wildfire for maintenance fees that accelerated under the Master Agreement following Wildfire's breach. Wildfire did not pay the invoice. Fiserv had also issued an invoice to Wildfire in October of 2014 "for Wildfire's first year of Maintenance Services for DNA." Id. at ¶ 18. Wildfire also did not pay that invoice. Wildfire has made no payments to date.

---

[1] The specific "live" date included in this portion of the DNA Software Schedule to the Software Products Exhibit is redacted in the publicly available Master Agreement. The Court has access to an unredacted copy of the Master Agreement that was placed under seal. The redaction has not yet been explained but the specific date is not relevant to the current dispute.

**E.**

The current dispute between the parties involves seven different provisions of the Master Agreement and its associated exhibits, schedules, appendices, and attachments (however they are characterized).[2] Those provisions will be set out here for ease of reference.

Three of the relevant provisions are found in the body of the Master Agreement itself (that is, not in any attachment). The Master Agreement was directly executed between Fiserv Solutions, Inc., and Wildfire Credit Union. The first of these relevant provisions is the preamble to the Master Agreement:

> MASTER AGREEMENT ("**Agreement**") dated as of July 18, 2013 ("**Effective Date**") between Fiserv Solutions, Inc., a Wisconsin corporation with offices located at 455 Winding Brook Drive, Glastonbury, CT 06033 ("**Fiserv**"), and Wildfire Credit Union, a Michigan credit union with offices located at 6640 Bay Road, Saginaw, MI 48604 ("**Client**").

Master Agreement Preamble, Ex. 1, Pl's Mot. J., ECF No. 46-2 (emphasis in original). The next relevant provision is the general agreement as to deliverables in the Master Agreement between Wildfire and Fiserv. The provision is as follows, in relevant part:

> (a) General. Fiserv, itself and through its Affiliates (as defined herein), agrees to provide to Client and Client agrees to obtain from Fiserv, the services ("**Services**") and products ("**Products**") (collectively "**Deliverables**") described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with a party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or party.

Master Agreement § 1(a), *id* (emphasis in original). The final relevant provision in the body of the Master Agreement itself is the termination provision. That section, in relevant part, provides:

> (i) Either party may, upon written notice to the other, terminate: (A) any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule; or (B) this Agreement if the other

---

[2] The Master Agreement, with all of its attachments, is included as an exhibit to Wildfire's motion for judgment on the pleadings. It is also attached to Wildfire's complaint. Thus, it is part of the pleadings and may be considered when deciding Wildfire's motion.

- 5 -

> party materially breaches its obligations with respect to the non-breaching party's information or other intellectual property; and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach.
>
> (ii) If any invoice remains unpaid by Client 30 days after due other than portions which are subject to a good faith dispute pursuant to Section 2(d) above, Fiserv may, upon 30 days' written notice to Client, terminate: (A) the Schedule and/or Client's access to and use of Deliverables to which the payment failure relates; or (B) this Agreement if the unpaid amounts constitute a material portion of annual charges due under this Agreement.

Master Agreement § 8(b), *id*.

Immediately following the body of the Master Agreement is the "Software Products Exhibit to Master Agreement." Section 11 of the exhibit concerns termination and provides in pertinent part:

> (a) The termination of the Agreement or this Exhibit or any individual Schedule hereto shall automatically, and without further action by Fiserv, terminate and extinguish the license(s) granted under the applicable Schedule and Fiserv's obligation to provide Maintenance Services with respect to such Software. . . . In addition, upon termination for any reason other than Fiserv's uncured material default pursuant to Section 8(b)(i) of the Agreement: (i) an amount equal to [redacted] of all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Fiserv pursuant to the payment terms set forth in the Agreement; and (ii) all credits, rebates, discounts, and incentives granted on all Software and Maintenance Services shall be reimbursed to Fiserv, and any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Maintenance Services.

Software Products Exhibit to Master Agreement § 11(a), *id*.

The next document attached to the Master Agreement is the "DNA Software Schedule to the Software Products Exhibit." The first relevant portion of this document is its preamble:

> This DNA Software Schedule (this "Schedule") is entered into by and between Wildfire Credit Union ("Client") and Open Solutions, LLC ("Open Solutions"), an Affiliate of Fiserv, and is incorporated into and made a part of that certain Master Agreement (the "Agreement") and Software Products Exhibit to Master Agreement by and between Client and Fiserv.

- 6 -

DNA Software Schedule to the Software Products Exhibit Preamble, *id*. The next portion disputed by the parties is § 1(h)(i). Section 1 is the "License Section" of the DNA Software Schedule. Subsection (h)(i), in relevant part, sets forth "Additional License Terms" under the DNA Software Schedule:

> Section 11(a) of the Software Products Exhibit shall not apply to any Software or Third Party Software listed under this Schedule. In the event Client fails to pay the License Fees or fails to comply with the terms and conditions of the Agreement, Software Products Exhibit or this Schedule related to the rights to use and use restrictions of the Software or Third Party Software, the license to the Software or Third Party Software licensed pursuant to this Schedule shall terminate. In addition, upon termination for any reason other than Open Solutions' uncured material default pursuant to Section 8(b)(i) of the Agreement: (A) an amount equal to [redacted] of all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Open Solutions pursuant to the payment terms set forth in the Agreement . . . .

DNA Software Schedule to the Software Products Exhibit § 1(h)(1), *id*. The final relevant provision of the DNA Software Schedule and the entire Agreement as provided by Wildfire is § 3. Subsections (a)&(b) govern the assessment of fees for maintenance services provided by Fiserv. The subsections provide:

> (a) <u>Term</u>. The initial term of Maintenance Services for Software and applicable maintenance services for Third Party Software shall commence on the effective date of this Schedule and continue for 7 years from the Live Production Date. Notwithstanding Section 5(b) of the Software Products Exhibit, after the initial term, Maintenance Services for Software and applicable maintenance services for Third Party Software shall automatically renew for successive [redacted] at Open Solutions' then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least [redacted] prior to expiration of the then current term.
>
> (b) <u>Maintenance Fees</u>. The Maintenance Fee for the Software licensed under this Schedule is as set forth on Attachment 1 to this Schedule. The Maintenance Fee is due and payable on the Live Production Date on a pro rata basis for the year in which the Live Production Date occurs, and thereafter every year on the anniversary of the Live Production Date.

DNA Software Schedule to the Software Products Exhibit § 3(a)&(b), *id*.

- 7 -

II.

Wildfire has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). "The standard of review for a [motion for] judgment on the pleadings [under rule 12(c)] is the same as that for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001). This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir.2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

III.

Wildfire makes two arguments in its motion for judgment on the pleadings. First, it argues that Fiserv's claims for early termination fees or maintenance fees must be dismissed for lack of standing and Open Solutions' claims under the Master Agreement must be dismissed for lack of standing. Second, Wildfire claims that Defendants' counter-complaint does not state a claim upon which relief may be granted because Wildfire is under no obligation to pay an early termination fee or an accelerated maintenance fee.

**A.**

Wildfire's first argument need not be overly analyzed. Wildfire claims that Fiserv cannot enforce the DNA Software Schedule because it is not a party to that agreement. That agreement, it asserts, is between it and Open Solutions, and only Open Solutions. On the latter point, Wildfire is correct. But the language in the preamble to the DNA Software Schedule states unequivocally:

> This DNA Software Schedule (this "Schedule") is entered into by and between Wildfire Credit Union ("Client") and Open Solutions, LLC ("Open Solutions"), an Affiliate of Fiserv, *and is incorporated into and made a part of that certain Master Agreement (the "Agreement") and Software Products Exhibit to Master Agreement by and between Client and Fiserv.*

DNA Software Schedule Preamble, Ex. 1, Pl.'s Mot. J., ECF No. 46-2 (emphasis added). There can be no reasonable argument, especially at the Rule 12 stage, that the Master Agreement incorporates the DNA Software Schedule. It is further difficult to understand how Wildfire argues that the DNA Software Schedule is not incorporated into the Master Agreement but at the same time acknowledges that it knowingly and willingly entered into the DNA Software Schedule.

The same can be said about Wildfire's argument that Open Solutions is not an affiliate of Fiserv. Wildfire attempts to disprove Open Solutions' affiliate status by explaining that Open Solutions is wholly owned by Harpoon Acquisition, LLC, and that Harpoon Acquisition is wholly owned by Fiserv.[3] Thus, Wildfire concludes: not affiliates. Wildfire bolsters this logic by

---

[3] Wildfire, seemingly somewhat confused, argues that Fiserv, Inc., the named Defendant is somehow different from Fiserv Solutions, Inc. (Fiserv represents that it is actually Fiserv Solutions, LLC), Wildfire's counterparty in the Master Agreement. In response to Wildfire's complaint Fiserv moved to dismiss and as part of that motion Fiserv requested that Fiserv Solutions, Inc., be substituted in for Fiserv, Inc., in the case's caption. That request was denied because the Court presumed that Wildfire properly named the party it intended to sue and because there was no evidence that Fiserv, Inc., was not an affiliate as that term is defined by the Master Agreement. Fiserv has not offered additional evidence of the relationship between Fiserv, Inc., and Fiserv Solutions, Inc., or renewed its request.

citing to Delaware corporate law, which strictly adheres to the doctrine that the separateness of distinct corporate entities is to be strictly respected and adhered to. That may be. But there is a rather significant difference between being a separate corporate entity and an affiliate. The two are not mutually exclusive. Wildfire does not offer any support for the novel proposition that they are.

In any event, at the Rule 12 stage, everything in the pleadings must be construed in the light most favorable to the non-moving party and all facts in the non-movants pleading must be accepted as true. To that end, Fiserv and Open Solutions plead that "Open Solutions is an 'Affiliate' of Fiserv as defined by the parties' Master Agreement." Defs.' Counter-Compl. ¶ 3. To the extent this is a legal conclusion that need not be accepted, Wildfire has not provided any authority to the contrary, as just explained *supra*.

Finally, and perhaps most importantly, the preamble of the DNA Software Schedule, which was signed by Wildfire provides:

---

Wildfire, for its part, in response to Fiserv's request to substitute parties, opposed the request. It argued that fraud or abuse of the corporate form, under Delaware law, is a sufficient predicate for disregarding distinctions between related corporations:

> The documents which Wildfire attached to its complaint demonstrate that Wildfire's course of dealings was with Fiserv, Inc. With regards to Wildfire's fraud and misrepresentation claims, Delaware law holds that the parent company, Fiserv, Inc., is a proper party and is liable for those claims. As to whether Fiserv, Inc. and Fiserv Solutions, Inc. are alter-egos, there simply is not enough evidence in this record for this Court to make such a determination. Therefore, dismissal of Fiserv, Inc. as a party is not proper under Fed. R. Civ. P. 12(b)(6). Instead, based on Fiserv's representation that Fiserv Solutions, Inc. is a proper party, Fiserv Solutions, Inc. should be added as a party defendant, not substituted for Fiserv, Inc.

Pl.'s Resp. 23, ECF No. 20.

Wildfire's present claim, in its motion for judgment on the pleadings, seeks protection based on the supposed differences between Fiserv, Inc., and Fiserv Solutions, Inc. It claims that Fiserv Solutions is certainly a party to the Master Agreement. But is Fiserv, Inc., a party? It's not so sure. The attempt to use the difference between the two as a sword and at other times a shield is, at the least, confusing. Wildfire elected to file suit against Fiserv, Inc., and attempted to keep Fiserv, Inc., in the case despite Fiserv's claims that Fiserv Solutions, LLC, was the proper party. Moreover, Wildfire, following Fiserv's motion to dismiss, began listing its case caption with the Defendant "Fiserv, Inc., a Wisconsin corporation, also known as Fiserv Solutions, Inc." *See, e.g.*, Pl.'s Mot. J., ECF No. 46. It appears, then, that Wildfire does not know the difference between Fiserv, Inc., and Fiserv Solutions, Inc., or at least concedes they are the same entity. Absent any factual proof, any future argument that attempts to cloud the distinction between the two, or create a distinction where none exists, should be withheld.

> *This DNA Software Schedule (this "Schedule") is entered into by and between Wildfire Credit Union ("Client") and Open Solutions, LLC ("Open Solutions"), an Affiliate of Fiserv*, and is incorporated into and made a part of that certain Master Agreement (the "Agreement") and Software Products Exhibit to Master Agreement by and between Client and Fiserv.

DNA Software Schedule Preamble, Ex. 1, Pl.'s Mot. J., ECF No. 46-2 (emphasis added). Wildfire has thus, on at least one prior occasion, admitted that Open Solutions is an affiliate of Fiserv. It now tries, unsuccessfully, to argue to the contrary.

Under the terms of incorporation in the DNA Software Schedule, Fiserv may enforce both the Master Agreement and the DNA Software Schedule. Similarly, under the affiliate inclusion in the Master Agreement and its designation as an affiliate in the DNA Software Schedule, Open Solutions may enforce both agreements. Both of Wildfire's arguments against these conclusions argue directly against the text of the agreement—the DNA Software Schedule—that it signed and ratified. Those arguments are meritless and not well placed.

**B.**

Wildfire next argues that it is entitled to judgment on the pleadings because it has no obligation under the Master Agreement or its attachments to pay an early termination fee or accelerated maintenance fees.[4] Wildfire makes two arguments for why it is not required to pay early termination fees and why it is not required to pay accelerated maintenance fees. They will be considered separately.

**1.**

First, Wildfire claims that it does not owe any accelerated maintenance fees because the condition precedent for Wildfire owing those fees—the DNA Software going "live"—was never

---

[4] The two fees are the same and provided for in identical provisions of the Master Agreement and the DNA Software Schedule. For ease the two identical fees will be referred to as an accelerated maintenance fee, as that term is more specific.

met. The payment terms upon which Fiserv relies in its counter-complaint are § 1(h)(i)[5] and § 3(a)&(b) of the DNA Software Schedule.

The effect of termination on Wildfire's obligation to pay maintenance fees is found in DNA Software Schedule § 1(h)(i). That section states that

> . . . upon termination [of the Master Agreement or DNA Software Schedule] for any reason other than Open Solutions' uncured material default pursuant to Section 8(b)(i) of the [Master] Agreement: (A) an amount equal to [redacted] of all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Open Solutions[.]

DNA Software Schedule § 1(h)(i). The "then current term of Maintenance Services" is in turn explained in § 3(a) of the DNA Software Schedule. That section explains that "[t]he initial term of Maintenance Services for Software . . . shall commence on the effective date of this Schedule and continue for 7 years from the Live Production Date." *Id*. at § 3(a). Per the terms of the contract, then, the term of maintenance services begins when the contract (here, the DNA Software Schedule) is executed and ends seven years after the "live production date."

The amount of fees owed, however, is a different matter, and is set forth in the next subsection, § 3(b). That section is titled "maintenance fees" and provides that "[t]he Maintenance Fee is due and payable on the Live Production Date on a pro rata basis for the year in which the Live Production Date occurs, and thereafter every year on the anniversary of the Live Production

---

[5] This provision, insofar as it provides for an accelerated maintenance fee, is identical to § 11(a) of the Software Products Exhibit to Master Agreement. The only difference between the two is that § 11(a) of the Software Products Exhibit names the payee for the accelerated fees as Fiserv, while § 1(h)(i) of the DNA Software Schedule names Open Solutions. In addition, it is possible that § 11(a), to the extent it relates to accelerated maintenance fees, is moot. Section 1(h)(i) of the DNA Software Schedule provides that "Section 11(a) of the Software Products Exhibit shall not apply to any Software or Third Party Software listed under this Schedule." The only relevant maintenance fees that appear to be contemplated in the Master Agreement are imposed pursuant to the DNA Software Schedule. For that reason, this Opinion will focus on the obligation imposed by § 1(h)(i) of the DNA Software Schedule, recognizing that § 11(a) of the Software Products Exhibit has materially the same force and effect.

Date." *Id*. The applicable maintenance fees are "as set forth on Attachment 1" to the DNA Software Schedule. *Id*. The fees listed on that attachment are entirely redacted.[6]

Accordingly, under § 3(a) of the DNA Software Schedule, Wildfire is responsible for fees arising out of maintenance work performed by Open Solutions from the time the DNA Software Schedule is executed between Open Solutions and Wildfire. That is, the current term for maintenance fees begins when the contract is executed. What § 3(b) provides, is the time when those accrued fees must be paid. Section 3(b) explains that the first payment of those fees is due on the "live production date." Wildfire is responsible to pay fees before that date if the DNA Software Schedule is "terminat[ed] for any reason other than Open Solutions' uncured material default pursuant to Section 8(b)(i) of the [Master] Agreement." *Id*. at § 1(h)(i). If the DNA Software Schedule is so terminated "an amount equal to [redacted] of all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated[.]" *Id*.

Counter-Plaintiffs allege that Wildfire breached the Master Agreement, triggering the acceleration provision. Taking the facts in the counter-complaint as true, as the Court must, Counter-Plaintiffs state a valid claim for accelerated Maintenance Fees under the DNA Software Schedule. Wildfire contends that the obligation to pay maintenance fees is contingent on the occurrence of a condition precedent—the live production date of the DNA software—that was not met. But as just explored, that is a condition precedent to Wildfire making a payment during the active term for maintenance services. It is not a condition precedent to Wildfire's obligation to pay the maintenance fees at some future date. The only condition precedent to Wildfire being

---

[6] The parties have provided an unredacted copy of all relevant documents constituting the Master Agreement. The actual fees as listed on the Attachment are not relevant at this stage of proceedings. It is only relevant to note that such a schedule exists.

subject to the duty to pay maintenance fees is it agreeing to the DNA Software Schedule with Open Solutions.

If Wildfire is contending that the failure of the condition precedent to its duty to pay means it is absolved of accrued maintenance fees, it is mistaken. The condition precedent falls away in the event of "termination for any reason other than Open Solutions' uncured material default pursuant to Section 8(b)(i) of the [Master] Agreement." DNA Software Schedule § 1(h)(i). In the event of termination the current maintenance term (which began when the contract was executed) ends and all accrued fees are immediately payable.

Ultimately, the dispute arises from Wildfire confusing the obligation to pay accrued maintenance fees with the obligation to make an actual payment against accrued maintenance fees. The two are different. Wildfire may begin accruing maintenance fees once the DNA Software Schedule is executed and assumes a liability to Open Solutions in the amount of those fees. By contrast, Wildfire is not obligated to make a payment toward those fees, barring termination under § 1(h)(i), until the live production date. Its liability for any accrued fees nevertheless remains and that liability can become immediately payable if the DNA Software Schedule terminates under § 1.(h)(i), as Open Solutions and Fiserv allege that it did.[7]

**2.**

Next, Wildfire argues that Counter-Plaintiffs' claim for accelerated maintenance fees should be dismissed because they materially breached the Master Agreement and that breach excused Wildfire's obligations under the Agreement. The claim is not supported by the pleadings. The Court is obligated to view the pleadings in the light most favorable to the non-

---

[7] Wildfire alleges that when it was invoiced for the accelerated fees it disputed the invoice in accordance with § 2 of the DNA Software Schedule but Counter-Plaintiffs did not adhere to the dispute-resolution terms of § 2. This is a factual argument for which no evidence has been adduced by Wildfire. Accordingly, it may not be considered on a motion for judgment on the pleadings.

moving party. Here, that party is Counter-Plaintiffs. Taken in that light, the pleadings allege that *Wildfire* was in material breach of its obligations under the Master Agreement. That allegation by Counter-Plaintiffs may be disregarded if contradicted by facts in the record at the pleading stage, which generally means documents attached to the parties' pleadings that then form a part thereof. But the only item attached to the pleadings is the Master Agreement, incorporated by being attached to Wildfire's motion for judgment.

Even if the pleadings were expanded beyond just the counter-complaint and Wildfire's answer, Wildfire could still not substantiate a breach by Counter-Plaintiffs as a matter of law at the judgment on the pleadings stage. The documents attached to Wildfire's complaint do not demonstrate anything more than a general dissatisfaction with the delivery of the DNA software product by Fiserv that then culminates in the termination of the project by Wildfire. Taken in a light most favorable to Counter-Plaintiffs, this does not amount to breach by Counter-Plaintiffs. Wildfire's argument is meritless.

### IV.

Finally, Wildfire requests, in the alternative, that the Court convert its motion, if necessary, to one for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The motion will not be converted. Under Rule 12(d) a court considering a motion under Rule 12(b)(6) or 12(c) must convert the motion to one for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d). No matters outside the pleadings have been presented so conversion is unnecessary. It would also be premature to convert the motion to one for summary judgment where the primary contentions of the parties concern which party breached the Master Agreement. This question requires factual

exposition. Neither party has furnished any justification for how a conclusion on the question of breach can be reached without it.

**V.**

Accordingly, it is **ORDERED** that Counter-Defendant Wildfire Credit Union's Motion for Judgment on the Pleadings, ECF No. 46, is **DENIED**.

Dated: February 19, 2016        s/Thomas L. Ludington
                                THOMAS L. LUDINGTON
                                United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 19, 2016.

                    s/Julie Owens
                    JULIE OWENS
                    Acting Case Manager